under the Revised Statutes, he was not vested with title to the property of the corporation. It is doubtless true that a receiver of a corporation, appointed pendente lite, does not possess all the powers of a permanent receiver; but nevertheless he is just as much the representative of both creditors and shareholders as though his appointment was invested with the quality of permanency. High, Rec. (3d Ed.) § 314; Gillett v. Moody, 3 N. Y. 479; Attorney General v. Insurance Co., 77 N. Y. 273. Among the duties now imposed upon him is that of receiving and preserving the property of the corporation (Code Civ. Proc. § 1788), and his relation to the parties whom he represents is so highly fiducial as to require of him the exercise of the utmost good faith in all his dealings. In the case of Alven v. Bond, decided by the Irish court of chancery (Flan. & K. 196), a receiver was appointed pending the action, which was for the foreclosure of a mortgage. Upon the sale under the decree a third party purchased a portion of the mortgaged premises for the receiver, and the sale was set aside for the reason that it was virtually a purchase by the receiver for his own benefit. It is contended by the learned counsel for the respondents that this case is in conflict with the decision of the courts of this country; and the principal case cited in support of this contention is Allen v. Gillette, 127 U. S. 589, 8 Sup. Ct. 1331, which holds that a trustee may purchase trust property at a judicial sale, brought about by a third party, which he had no part in procuring, and over which he had no control. It will be seen at a glance that the principle thus enunciated has no application here, for the reason that the plaintiff bases his right of action mainly upon the allegation that the receivers were parties to a scheme by which the sale was brought about in the manner and under the circumstances detailed in the complaint.

The questions involved in this appeal have been considered, as it was said at the outset they would be, upon the assumption that every allegation of the complaint, and every fact which may be reasonably and fairly inferred therefrom, is conceded by the defendants to be true. Of course, when these allegations and facts are traversed by an answer, the situation will be entirely changed; but, as the case now presents itself, we are constrained to hold that the demurrers cannot be sustained.

Interlocutory judgment reversed, and demurrers overruled, with costs, but with leave to the defendants to withdraw their demurrers and answer upon payment of the costs of the appeal, and of the trial of the issue of law. All concur.

---

(33 App. Div. 23.)

CLARKSON et al. v. WESTERN ASSUR. CO.

(Supreme Court, Appellate Division, Fourth Department. July 26, 1898.)

1. FIRE AND MARINE INSURANCE—CONCEALMENTS BY APPLICANT.
    The subject of a fire insurance risk was a vessel laid up in a harbor several hundred miles from the place where the insurance was effected. She was so detained by reason of an accident in which it had been necessary to jettison several hundred barrels of kerosene, and pour over the sides of the vessel a large number of barrels of lubricating oil, thus

greatly increasing the risk from fire. *Held* that, where the underwriters were not made acquainted with this condition of the vessel, the insurance was void.

2. APPEAL—DECISION—NEW TRIAL.

The failure of a trial court to consider a vital question, which a party is entitled to have adjudicated, is ground, on appeal, for ordering a new trial.

Ward, J., dissenting.

Appeal from trial term, Erie county.

Action by Edward R. C. Clarkson and others against the Western Assurance Company to compel the delivery of a policy of insurance, or payment of the amount of the policy. From a judgment for plaintiffs, and an order denying a motion for a new trial, defendant appeals. Reversed.

In December, 1890, Charles H. Blakeslee and Melville F. Brown, of Rochester, N. Y., who were doing business under the firm name of the Rochester Transportation Company, purchased of the plaintiffs and one Thomas Maytham, since deceased, the steamer Northerner, for the sum of $50,000. They paid $1,000 in cash, and gave back a mortgage upon the steamer for the balance of the purchase price, upon which mortgage there was due at the time of the trial of this action the sum of $26,595.82. In March, 1892, Blakeslee and Brown chartered the Northerner to one Eber Ward, of Detroit, Mich., for purposes of navigation upon the Great Lakes during that season. The "season," as ordinarily understood, ends on the 30th of November; and policies of marine insurance generally expire at that time, but extensions are frequently granted, in individual cases, after that period, at special rates. The Northerner left Buffalo on the 2d December, 1892, in charge of one Capt. McKinnon, who represented the charterer, and stopped at Cleveland, where she took on her cargo, consisting of about 4,000 barrels of kerosene oil and a number of barrels of lubricating oil. Leaving Cleveland on the 5th December, the vessel stopped at St. Clair, where 100 tons of hay were added to the cargo, and again at Detroit, where more hay was taken on board, a portion of which was delivered to the consignee at Marquette. On the 7th of December the vessel was stranded at Keweenaw Point, on Lake Superior, and remained in that position from 5 o'clock in the morning until about half past 2 o'clock in the afternoon. During this time about one-half of the kerosene oil and a considerable portion of the lubricating oil was jettisoned, and by this means the vessel was enabled to get afloat, but it was found that she was badly disabled, and was leaking at the rate of 10 inches an hour; and in this condition she made for the harbor of L'Anse, some 30 or 40 miles distant from Keweenaw Point, which place she reached during the forenoon of December 8th. The original destination of the Northerner was Duluth, but, owing to the accident which had occurred, and the injury to the vessel which resulted therefrom, the trip was abandoned, the consignees of the cargo were notified of the fact, and arrangements were made to lay the vessel up for the winter at L'Anse. In the meantime the marine insurance, by special arrangement, had been extended until such time as the vessel should reach its destination. Upon reaching L'Anse the owners and the charterer were informed by telegram of the accident to the steamer, and of the condition she was in, and, in accordance with instructions received from them, the captain and crew took steps to strip and dismantle the vessel, preparatory to mooring it for the winter; but before the process of stripping had been completed the captain was notified that the underwriters desired the vessel to proceed to Duluth under charge of one Capt. Rounds, who came on to L'Anse for that purpose. Upon receipt of these later instructions, the crew of the steamer proceeded to put it in condition to proceed on its way; but before the preparations were completed an altercation took place between Capt. Rounds and Capt. McKinnon, which resulted in the former abandoning the steamer, in consequence of which it remained moored at the dock at L'Anse. Upon receipt of the telegram announcing the arrival of the steamer at L'Anse, and on the morning of Decem-

ber 9th, Mr. Blakeslee, one of the owners, telegraphed Mr. Edwin T. Hitch-cock, an insurance broker residing in the city of Buffalo, to obtain fire in-surance upon the vessel; and, in accordance with such instructions, Hitchcock went to the office of Smith, Davis & Co., insurance agents, and applied for $50,000 fire insurance. The application for this amount of insurance was declined, but the agents finally consented to insure for the sum of $45,000; distributing the risk among a number of the companies which they repre-sented, including the defendant, in which company it was agreed a policy of $6,000 should be issued. No policy, however, was issued at the time, and no premium was paid thereon; but it was the custom of Smith, Davis & Co. to receive applications for insurance made by Mr. Hitchcock, and to charge him with the premiums thereon, the policies being delivered at their con-venience, and that was the understanding and agreement in this particular instance. On the 12th of December, early in the forenoon, while moored at the dock at L'Anse, the Northerner was burned and totally destroyed. Thereafter, Smith, Davis & Co. were tendered the proper premium for the defendant's insurance; but they refused to receive the same, or to deliver the policy which was demanded. Thereafter the interest of Blakeslee and Brown in the cause of action was assigned to the plaintiffs, and this action was commenced to compel the delivery by the defendant to the plaintiffs of a policy of insurance for $6,000, or the payment of the amount thereof. Issue was joined in the action, and certain questions of fact were framed therein, all of which involved the inquiry as to whether or not the steamer Northerner was on the 9th day of December, when the contract of insurance was made, and on the 12th of the same month, when the fire occurred, laid up at the port of L'Anse. The issues thus framed were tried, and the questions submitted to the jury were all answered by them in the affirmative. Subsequently the case came on for trial upon all the issues, which was denied, and the trial was continued before the court, which found in favor of the plaintiffs and against the defendant; and from the judgment entered thereon, as well as from the order denying the defendant's motion for a new trial, this appeal is brought.

Argued before HARDIN, P. J., and FOLLET, ADAMS, GREEN, and WARD, JJ.

George Clinton, for appellant.
Norris Morey, for respondents.

ADAMS, J. This case appears to have been twice tried. Upon the first trial a verdict was directed in favor of the defendant, which was set aside by the general term, and a new trial ordered. Several of the questions which are involved in the present appeal were liti-gated upon the former trial, and adjudicated by the general term when the case was in that court for review. It was there contended by the defendant, as it is now, that the plaintiffs were not entitled to recover, for the reason that, in the application for insurance by the assured, it was represented that the vessel was "laid up" at L'Anse, whereas in fact it was, at the time the contract of insurance was entered into, and at the time the fire occurred, preparing to continue its voyage to Duluth. Upon the first trial this was treated as a question of law, and, as already stated, it was decided by the trial court in favor of the defendant; but it was held by the general term (92 Hun, 527, 37 N. Y. Supp. 53) that the evidence upon this subject, which was not materially different from that contained in the present record, present-ed an issue of fact, which ought to have been submitted to the jury. The procedure, therefore, which was adopted, and the result which was reached, upon the second trial, ought not, so far as this particular question is concerned, to be disregarded by this court, unless it be

made to appear either that the former decision was clearly erroneous, or that the verdict was unsupported by evidence. There certainly was a very sharp conflict in the evidence which bore upon this feature of the case. Upon the one hand, it was made to appear that after the vessel had reached L'Anse, and the process of dismantling had commenced, instructions were received from the charterer to resume the trip to Duluth, the original point of destination, in consequence of which the work of stripping the vessel preparatory to its being laid up for the season was suspended; and it was to some extent, at least, put in condition to complete its trip. Upon the other hand, evidence was given which tended very strongly to show that notwithstanding these instructions, and the steps taken by reason thereof, the idea of proceeding any further was abandoned prior to the fire in consequence of the refusal of the party authorized by the underwriters to take charge of the vessel to have anything further to do with it after his quarrel with the captain. There was likewise considerable expert evidence given to prove that the vessel was, and that it was not, "laid up," within the definition of that term as it is understood by navigators and persons engaged in the business of fire and marine insurance. But, without entering further into the details, it is sufficient to say that, if the question of whether or not the steamer was actually laid up was one of fact, the verdict of the jury is not without evidence to support it, and it is therefore conclusive upon this court.

Several other propositions are pressed upon our attention by the learned counsel for the defendant, which were disposed of upon the former appeal; and, as already intimated, as to those we are inclined to regard the decision of the late general term as the established law of the case for the purposes of this review. There is, however, one question presented upon this appeal, which, to our mind, is of vital importance; and yet, for some unexplained reason, it has not, up to the present time, been regarded as a very potent factor in the case. We refer to the omission of the owners of the vessel to disclose the condition it was in at the time application was made for its insurance. It is an undisputed fact that the disaster which overtook the Northerner when it ran aground at Keweenaw Point was a very serious one; that, in order to get the steamer off the ground, a large portion of its cargo was jettisoned; that, when righted, it was discovered that the vessel was leaking at the rate of 10 inches an hour, in consequence of which it became necessary to seek a haven of safety, and to keep the steam up and the pumps working in order to prevent the vessel sinking. It also appears that some 2,500 barrels of the kerosene oil were jettisoned, and that a large number of barrels containing lubricating oil were broken open, and their contents poured over the side of the vessel. This operation must of necessity have saturated the vessel with oil, and very materially increased the risk from fire. Indeed, several witnesses called on behalf of the plaintiffs testified that, by reason of the condition the vessel was in when it reached L'Anse, the risk would have been regarded as an extraordinary one, and one which it would be difficult, if not impossible, to get any insurance company to accept, if the facts were known. It appears that immediately upon reaching the harbor of L'Anse both the

charterer and owners were notified by telegram of the accident which had befallen the vessel, and of the condition it was in. Mr. Ward, the charterer, testified:

"I heard of the disaster to the Northerner in December, 1892. I think it was the 7th or 8th of December. I became acquainted with the facts from a telegram received from Capt. McKinnon, of the boat, from L'Anse. I answered the telegram, to the effect that he had better lay up there. As soon as I had done that, I telegraphed Mr. Blakeslee, the managing owner, of Rochester, that the boat was at L'Anse, and would remain there, and to place his fire insurance."

Mr. Blakeslee also testified that he was advised of the arrival of the vessel at L'Anse, and of the disaster at Keweenaw Point; and it appears that he thereupon telegraphed Mr. Hitchcock to obtain the necessary insurance, which, as we have seen, was accomplished the following day,—the underwriters, as well as Hitchcock, being in entire ignorance of the actual condition of the vessel at the time the contract of insurance was entered into. In view of these conceded facts, the inquiry which at once suggests itself is, what, if any, duty of disclosure rested upon the assured when making application for insurance upon this property? A contract of insurance is one which requires perfect good faith upon the part of the insured, upon whom the obligation rests not to suppress any facts and circumstances material to the risk which would mislead the company, and thereby induce it to assume a risk which it would not assume if such facts and circumstances were disclosed. Skinner v. Norman, 18 App. Div. 609, 46 N. Y. Supp. 65. It has long been the well-settled law of marine insurance that the concealment of a material fact avoided the contract. Watson v. Delafield, 2 Johns. 526; Gates v. Insurance Co., 5 N. Y. 469; McLanahan v. Insurance Co., 1 Pet. 170. And in the case last cited it was held that if the owner possesses secret information respecting a fact material to the risk, and with such knowledge permits his agent to procure insurance in ignorance of the existence of the fact, for the purpose of misleading the underwriter, it is no less a fraud than it would be if he made the application himself. And, although the same general principles are said to apply to the contract of fire insurance, it has been held that, in the absence of fraud, "if the applicant for such insurance make a full and true answer to the questions put to him by the insurer, it is enough. He is not answerable for an omission to mention the existence of other facts, about which no inquiry is made of him, though they may turn out to be material for the insurer to know in taking the risk." Gates v. Insurance Co., supra. This difference between marine and fire insurance is said by an accepted authority upon the subject to be not "so much one of doctrine as of the subject-matter, and of the degree of confidence necessarily placed in the assured by the underwriter." 1 Phil. Ins. § 635. Property insured against loss or damage by fire is, says this same author, "usually stationary, and the risk local, and within the limits of actual inspection by the insurers or their agents. * * * And, besides, the inquiries put to the assured, his answers to which are usually referred to in the policy, are intended by the insured to cover, and usually do cover, all the circumstances affecting the risk material to be disclosed." And he then states the rule to be

that "any circumstance evidently and materially enhancing the risk of fire, known to the applicant at the time of insuring, and not so, or presumed to be so, to the insurer, and of which he is not bound to inform himself or to take the risk of it, must be disclosed, though no inquiry is made respecting it." 1 Phil. Ins. § 635. The application in this case does not disclose that any questions were asked, or any information imparted by the assured, save that the vessel was "laid up at L'Anse, Mich.," and that the risk was of such a character as to entitle it to be classified by the company as "A2"; and it is not disputed that it would not have been thus classified if the actual condition of the vessel had been known to the underwriters. But, even had there been other inquiries and answers, we do not think that there would exist in this case any reason for applying a different rule of obligation to the assured than would have been the case if they had applied for marine instead of fire insurance. The subject of insurance was a vessel which was laid up in a harbor many hundreds of miles distant from the place where the insurance was effected. It was consequently not "within the limits of actual inspection by the insurers or their agents." In accepting an application for insurance under these circumstances, the underwriters had a right to assume that the owners or their agent would act in perfect good faith, and disclose any and all facts material to the risk of which they had any knowledge; and it seems to us that they were under precisely the same obligation to do so as they would have been had they been seeking to obtain an insurance of their vessel against the perils of water. It was stated upon the trial, and not disputed, that if this obligation had been fulfilled, and the underwriters informed of the condition the Northerner was in, they would probably have refused the risk. Consequently, to have concealed from them its true condition was, in our opinion, almost, if not quite, equivalent to an actual fraud. This question is one which the defendant is entitled to have adjudicated, but it is one which, as has already been suggested, does not appear to have been considered by the trial court; and for this reason we feel constrained to order a new trial, when possibly other and different facts may be made to appear.

Judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except WARD, J., who dissents.