# SUN INSURANCE OFFICE, LIMITED, *v.* ABRAM J. MALLICK.

## [No. 48, October Term, 1930.]

*Decided January 13th, 1931.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Walter L. Clark* and *Herbert Levy,* with whom were *A. B. Makover, Jacob Kartman, Clater W. Smith,* and *Morris Rosenberg,* on the brief, for the appellant.

*W. Calvin Chesnut* and *S. Ralph Warnken,* with whom were *Haman, Cook, Chesnut & Markell* on the brief, for the appellee.

Digges, J., delivered the opinion of the Court.

In September, 1927, a "fine arts" policy of insurance was executed by the appellant and appellee in the amount of $75,000, "covering on an original manuscript on sheepskin 'The Seven Books of Moses' consisting of eleven rolls, valued at $75,000." The policy also provides: "This policy covers the property insured hereunder as described herein against loss or damage by accident, collision, derailment, fire, theft or water or loss or damage of any kind whatsoever, except as hereinafter excluded. * * * This entire policy shall be void if the assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof; or in case of any fraud or false swearing by the assured touching any matter relating to this insurance or the subject thereof, whether before or after a loss. * * * In case of loss or damage, this company shall pay or make good to the assured such loss or damage up to but not exceeding the amount set opposite the several articles covered hereunder as shown above or as per schedule attached to this policy, which amounts are agreed to be the values of said articles for the purpose of this insurance. * * * In the event of loss, immediate notice with full particulars must be given or mailed by the assured to this company or its agent." The property was described as being located in the dwelling house of the assured at 2730 St. Paul Street, Baltimore, Md..; and the period covered by the contract was from noon on the 23rd

day of September, 1927, to noon, September 23, 1928. It will be seen that the contract was a "fine arts insurance policy," and was a "valued policy," which means that the parties had liquidated or agreed upon the amount to be paid by the company in case loss occurred through the happening of any risk insured against. In other words, the parties agreed in advance (at the time the contract was executed) that the damage suffered by the assured in case of loss should be $75,000, without regard to the intrinsic or market value of the article. By the contract the parties agreed, not upon the value of the article insured, but on the amount to be paid by the company in event of loss. It is alleged that on the night of the 9th-10th of February, 1928, the insured property was stolen. Theft being one of the risks insured against, the appellee notified the company and made claim for $75,000, the amount at which the insured property was valued in the policy. After considerable negotiation back and forth, the right to recover was denied and the claim refused by the company. Whereupon suit on the policy was instituted in the Superior Court of Baltimore City on September 22nd, 1928. On January 30th, 1930, the case was heard by the court sitting as a jury, and resulted in a verdict and judgment for the appellee for $75,000. The appeal here is prosecuted from that judgment.

The record in this case consists of more than nine hundred pages and contains all of the testimony produced in the trial below. There are forty-seven exceptions in the record, forty-six to rulings on evidence and one to the ruling on the prayers. Thirteen prayers were offered by the plaintiff, to which the defendant objected, and filed special exceptions to the plaintiff's first prayer. The court granted the plaintiff's first prayer and overruled the defendant's special exception thereto. The defendant offered sixty-seven prayers, fifteen of which were granted as offered, and twelve were granted as amended by the court.

The volume of the record in this case is largely made up of testimony which was necessary and pertinent for the de-

cision of matters of fact submitted to the jury, and which, having been passed upon by the jury, have no proper place in the consideration of the case by this court except in so far as it be necessary in order to determine the legal questions presented. Such evidence will be stated as briefly as a clear understanding of the case will permit. Mallick, the appellee, is a native Persian; his father was a well educated Persion, Reverend Moses Jacob Mallick, a Protestant missionary, a man of culture, of above the average means, who had traveled extensively in Europe and once in the United States. Reverend Mallick had a large family, of good standing. He appears to have owned a large house and ground, and conducted a school and orphan asylum near Urmia. At the age of fourteen the appellee came to this country in 1900, attended school for some time, and engaged in various occupations. He went back to his father's home in Persia about 1911, and was married in 1912, in the latter part of which year he returned to this country, and was followed by his wife several years later. His father was among those massacred by the Turks and Kurds in 1915. The appellee testified that before leaving Persia in 1912 his father gave him the manuscript which is the subject matter of the insurance, explaining it was ancient and would one day be a "fortune"; that his father got the manuscript from a "secret room"; and that he (the appellee) brought it to the United States in 1912. Upon his return to this country he worked for a while for various parties in Baltimore, and at all times dealt in rugs as a side line. Finally in 1917 he established himself permanently in the rug business at 919 North Calvert Street, Baltimore. This business seems to have prospered to such degree as to enable him to own his store at the address stated, and also his home at 2730 St. Paul Street, which he purchased and put in his wife's name and which is still subject to a small mortgage. At the time the insurance policy was issued, he had good credit and was in good standing with his banking connections, and this condition has continued. The manuscript or scroll which was insured was kept in the appellee's store prior to 1927, at which place it was shown by

him to a number of witnesses who testified to having seen and examined it. It appears that about 1926 the appellee read of a large sum having been obtained for old stamps, up to which time he does not seem to have attached much value to the manuscript. About this time he talked with Mr. A. J. Grape, the president of the bank in which appellee deposited, about the manuscript which he had, and later took it to Mr. Grape, who gave him a receipt for it, with the understanding that he would send it to his uncle, Mr. Jacob Grape, who was at the University of Pennsylvania, in an effort to ascertain its value with a view to selling. It was sent to Jacob Grape, who exhibited it at a club known as the Oriental Club, which seems to have been made up of instructors, students, or investigators in Oriental archæology with special reference to Semitic subjects. Jacob Grape submitted to his nephew in Baltimore a report fully describing the manuscript, and a letter in which it was stated that the Jewish members of the Oriental Club seemed to be more interested than others, and desired more information in respect to the history of the manuscript than he was able to give, and stated that, with the information he had, no one was willing to place a higher value upon the manuscript than $300. This letter also stated that Jacob Grape, at the suggestion of the head of the Semitic Department, had taken the manuscript to Professor Greenstone, who told him that "synagogue documents of this sort are imported into the United States from Oriental countries where they are made, and that they cost Hebrew congregations from $75 to $250 apiece, but the columns are usually written on parchment, which is thinner than these hides and sometimes longer than this one is (93 feet)." There seems to be no contradiction that Mallick was acquainted with the contents of these communications. Subsequently the manuscript was returned by Grape to the appellee, and later was given by him to a cousin, Yonan, who lived in Yonkers, N. Y.; the purpose of this delivery being to make further investigations as to value and prospects of sale. A receipt was given by Yonan to Mallick, in which it was agreed that the

manuscript would be insured for $150,000 in favor of Mallick. Mallick later visited Yonkers, and while there the manuscript was examined by agents with a view to insuring same, but this did not result in a policy being issued.

F. Albert Roloson is a member of the insurance firm of Henry M. Warfield-Roloson Company, had known Mallick for several years prior to the issuing of the policy, and had purchased rugs from him. Mallick had been to his house on several occasions, and Roloson had talked to him a great deal about conditions in Persia. He testified that the first time he saw the manuscript was on September 2nd, 1927, when Mallick called him over the phone and asked him to come to his house to talk about business; that Mallick had told him prior to that time that he was going to give him some of his insurance; that he went to Mallick's house and was shown the manuscript; "there were eleven separate rolls of very soft skin, which he said was sheepskin, and looked to me like that, as far as I could tell"; that Mallick told him he wanted to take the manuscript to New York for the purpose of trying to sell it, and wanted a policy to cover it while there; that he told Mallick "he could get it covered if he sent it by registered mail or express, but I did not know whether we could cover it with him carrying it or not, that was not the way to insure it, if it was valuable, he ought to insure it all the time and not part of the time; my suggestion was if he could get an all-risk policy at a reasonable price, he ought to cover it all the time"; that Mallick did not give him an order for the insurance at the time, but "asked me to get him a rate"; that witness then got in touch by telephoning with John Gildea, representing several marine companies, who wrote this character of insurance, and requested Gildea to give a quotation as to a rate, and the following day witness was quoted a rate of one per cent. for a policy of $100,000; this was reported to Malick, who stated that he would not pay the premium on $100,000; this premium was the rate for one year on a "valued policy" for $100,000. Witness told Mallick that he expected to go to New York some time in the month, which

place was the best market for that kind of insurance, and would take the matter up, and let him know if he could get a better rate. He went to New York about the end of the month and saw Mr. Myerle, connected with the firm of Ream, Wrightson & Co., with whom Roloson had done business, and talked to him in regard to this insurance: "I told him I had an all risk client, a party who wanted an all risk policy on a manuscript, valued at $100,000. He said, yes, I can place it for you." While Roloson was present Myerle telephoned to Macomber & Co., the agent of the appellant, and told them substantially that he had an inquiry from Baltimore for a $100,000 all risk on a manuscript and asked what rate they would quote. While talking to Macomber & Co., Myerle turned to Roloson and asked "where the manuscript was, and I said, in a private residence. He repeated it in the phone and then asked me what the fire insurance rate would be on such a residence. I told him forty cents per hundred, and then he put his hand over the phone and said, about five-eighths. I said that would be all right, and he then said into the phone, I think I have a bid of three-quarters rate, will you take it for five-eighths? He said, all right, and hung up the receiver and turned to me and said he would write it for five-eighths." Myerle also asked Macomber & Co. whether there would be an additional charge for taking the manuscript to New York, and was told there would be ten cents per hundred additional. Myerle then said to Roloson: "Do you think that will get the business?" Roloson said: "I will let you know." He then saw Mallick a day or two after his return, discussed the matter with him, and told him the premium would be five-eighths per cent. on $100,000; and Mallick finally decided to take $75,000 insurance. Roloson further testified: "I wrote a letter to Mr. Myerle and asked him to secure a binder on it. I expected then that they would send down and ask for some one to appraise or do something of that sort, but they did not do it, and sent the policy down, very much to my surprise. I asked for a binder but I thought we would not be able to get the policy until they had made an investigation." The letter referred to is:

"September 22, 1927.

"Messrs. Ream, Wrightson & Company,

"67 Wall Street, New York City.

"Attention: Mr. E. T. Myerle.

"Fine Arts Floater.

"Gentlemen:

"In line with our conversation of Tuesday, will you please secure binder in the name of Abram J. Mallick for $75,000.00 all risks cover on an original manuscript on sheepskin, 'The Seven Books of Moses,' consisting of eleven rolls, covering in the residence of the insured at 2730 St. Paul Street, Baltimore, Md., at a rate of ⅝%, the insured to have the option of covering transit to New York at a rate of 10c.

"No transit is desired at this time.

"For your general information as to the moral hazard, the insured is a Persian who came to this country in 1915 and has been in business at 919 North Calvert Street, this city, since 1917. He owns the building at that location and also owns his residence, the address of which is given above. We have known him for several years and from what we have been able to learn about him, he has borne during his entire stay here a very excellent reputation, having among his customers a number of our very best people, who have dealt with him for years.

"We are told he comes from one of the best families of Persia, his father, who was Rev. Jacob Mallick, was a Presbyterian minister at Orumia, Persia, having been educated at Oxford and Heidelburg. This manuscript is a family heirloom that, he tells us, has been in his family for several hundred years. The writer has seen it and while I am not a judge of these things, it looks to be what he claims it is.

"Assuring you of our appreciation of your handling this business for us, we are, yours very truly,

"Henry M. Warfield-Roloson Company, Inc.,

"E. Albert Roloson, Treasurer."

Witness Roloson was then asked: "Q. Did you write that letter at the request of Mr. Mallick or was it voluntary information to Mr. Myerle or was it that Mr. Mallick asked you to write the letter? A. No, Mr. Mallick, after he agreed to pay the premium, he said, Go ahead and get the insurance. In sending the order forward to Ream, Wrightson & Company, following out what has been my experience and the custom in handling such transactions, we expected them to bind this insurance pending an investigation of the man and the risk. When I gave them the information it was information on which to bind and also a line for investigation. I volunteered certain information." This letter was written in Baltimore on September 22nd, 1927, was received by the appellant on September 23rd, on which date a binder was issued, and on September 28th the policy was executed and ultimately delivered to Mallick.

By the granting of the defendant's first prayer, the court determined as a matter of law that it appeared from the uncontradicted evidence in the case that the contract of insurance sued upon was executed and delivered in the State of New York and was intended to be performed in the State of Maryland, and therefore the common law and statutes of New York determined the binding effect of the contract as to whether the same is effective or void or voidable for misrepresentation, breach of warranty, or other matters determinative of whether the contract was a valid and existing obligation at the time of the alleged loss, and that the common law and statutes of Maryland govern the construction of the contract with reference to the sufficiency of performance after loss, and especially as to the legal sufficiency of the evidence of loss, the performance of the condition requiring full particulars of the loss, and the condition making the policy void in case of any fraud or false swearing by the assured touching any matter relating to this insurance or the subject thereof after a loss. It will therefore be seen that the questions in relation to which the law of the State of New York should govern, and the questions in respect to

which the Maryland law should govern, were determined in accordance with the views of and at the request of the defendant. The granting of this prayer was excepted to by the plaintiff, and he not having appealed, because of a judgment in his favor, the correctness of the legal proposition embodied in the prayer would not ordinarily be the subject of comment in this court. However, a considerable portion of the briefs of the respective parties is devoted to this question, and we deem it wise to express our views in regard thereto, not so much for the effect in the determination of the matter now before us (because practically there seems to be little difference between the law of New York and Maryland on this subject), but in order to avoid the possible implication which might be made the basis of contention in future cases.

There can be no doubt that it is the settled law of this State that the *locus contractus* is that place where the last act which makes the agreement a binding contract is performed. In *Union Trust Co. v. Knabe*, 122 Md. 584, 89 A. 1106, 1114, it was said: "A contract is made where the last act is done to make it a binding obligation upon the parties to it. *Cromwell v. Royal Ins. Co.*, 49 Md. 366, 33 Am. Rep. 258; *Stevens v. Rasin Fertilizer Co.*, 87 Md. 679, 41 A. 116; *Latrobe v. Winans*, 89 Md. 636, 43 A. 829; *Expressman's Ass'n v. Hurlock*, 91 Md. 585, 46 A. 957; *Northwestern Life Ins. Co. v. McCue*, 223 U. S. 234, 32 S. Ct. 220, 56 L. Ed. 419; *Northampton Ins. Co. v. Tuttle*, 40 N. J. Law, 476; *Milliken v. Pratt*, 125 Mass. 374; *Irving Nat. Bank v. Ellis*, 74 N. J. Law, 42, 64 A. 1071." *Fidelity Mutual Life Ass'n v. Ficklin*, 74 Md. 172, 21 A. 680, 23 A. 197. The appellant cites sections 340, 341, and 342, *Conflict of Laws Restatement, Tentative Draft* No. 4, as sustaining its contention; and while these statements are not binding upon us, yet we are inclined to give adequate weight to them in cases where they do not conflict with previous decisions of this court. The provisions cited are: "340. When an insurance policy becomes effective upon delivery by mail, the

place of contracting is where the policy is mailed. 341. When an insurance policy becomes effective upon delivery and is sent by the company to its agent and by him delivered to the assured, the place of contracting is where it is thus delivered to the assured. 342. When an offer for an insurance contract is received by the company through a broker who acts for a client, and the policy is effective on delivery, the place of contracting is where the policy is delivered to the broker. (a) The broker may be an agent of both parties; but in receiving the policy from the company he is ordinarily acting as agent of the assured rather than of the company." The effect of these provisions, in our opinion, is not in conflict with the decisions of this court above cited, but rather in harmony therewith, and they in no wise contradict the statement made in *Union Trust Co. v. Knabe, supra*, that a contract is made where the last act is done to make a binding obligation upon the parties. The question really is as to the application of the rule to the facts of this case, that is to say, where was the last act performed which made the contract of insurance a binding obligation between the parties?

It is undoubtedly true that a broker may be the agent for both parties in respect to particular acts to be done in consummation of the contract of insurance. Here the delivery of the policy to the appellee, and the collecting or securing the payment of the premium, was the final act which put the contract in force. Roloson, or his company, was the agent of the appellee in soliciting the insurance, and his representations effecting the formation of the policy were, as stated, binding upon the appellee; but for the purpose of delivering the policy and collecting the premiums for the use of the appellant he was as certainly its agent. This being true, and it being also true that the policy was delivered and the premium collected or secured in Maryland, in our opinion, it is a Maryland contract. In *Stevens v. Rasin Fertilizer Co., supra*, the decision turned upon the question of whether the policy of insurance was a Maryland or a Massachusetts contract. It was held to be the former. The

facts of that case were practically identical with this case. The contract was one of fire insurance. The insured was a Baltimore corporation, which applied to a Baltimore broker for insurance. The Baltimore broker, in turn, applied to New York brokers, who secured the policy of insurance from a Massachusetts company located in Boston. The policy was written and executed by the company in Boston, and mailed to the New York brokers, who in turn by mail sent it to the Baltimore or originating broker. The Baltimore broker delivered it to the insured and collected the premium. Under these circumstances, it was determined to be a Maryland contract, because the act consummating the contract was the delivery of the policy and the collection of the premium, which took place in Maryland; and although the Baltimore broker was the agent of the insured in making the application, for the purpose of delivery of the policy and collection of the premium he was the agent of the Massachusetts company.

It being determined that the contract evidenced by the policy is a Maryland contract, we are next to consider whether it is such a contract as the rules of law applicable to marine insurance should govern in its inception and formation; or, in other words, is the validity of a fine arts all risk covered valued policy of insurance to be determined by applying the rules of marine insurance, or should we apply the law as settled in respect to other insurance? We have been cited no decision or other authority in which this question has been presented, and we have been able to find none. We will therefore treat it as a case of first impression, and we think its decision can be reached by ascertaining to which of the above stated classes of insurance this character of policy bears the closer analogy. It is a valued policy, which is usually characteristic of marine policies but is by no means confined to such insurance. It is entirely adaptable to other forms of insurance, and is found in fire, accident, and other policies; and, as above stated, simply means that the parties have agreed upon liquidated damages arising from loss by the peril

insured against. A fine arts policy may be either an open or valued one, although the latter seems to be the preferable form, because the true value of the articles thus insured is at least very difficult of ascertainment, and is, after all, largely a question of opinion. The insured, in the application, gives his opinion as to value; and the company, by issuing the policy, accepts that value, thereby ratifying the opinion of the applicant, and agreeing that in case of loss the value stated in the policy shall be the amount recoverable, no more and no less. In all other respects, as gathered from the face of the policy, there is no material distinction between the conditions, agreements, and stipulations therein contained and those usually found in fire or accident policies. In *May on Insurance* (4th Ed.), vol. 1, sec. 30, the author, in discussing kinds of policies and dealing with insurance other than marine, pointing out the distinction between an open and a valued policy, states: "The difference between them in point of effect is, that under an open policy, in case of loss, the insured must prove the true value of the property insured, while under a valued policy he need never do so, the sum agreed upon being taken as conclusive both at law and in equity, unless in cases of fraud, or of such excessive overvaluation as to raise a presumption of fraud. And the overvaluation, in the expressive language of Mr. Justice Yeates (*Miner v. Tagert,* 3 Bin. [Pa.] 204), must be 'grossly enormous' to admit of any dispute. The statement as to value of property insured is not a warranty but matter of opinion, which, if honestly entertained, does not vitiate the policy."

The appellant contends that a fine arts policy is analogous to a marine policy, in that the difficulties of verifying the truth of statements or representations made by the applicant are the same, and, further, that the contract is required to be promptly executed and without time necessary for investigation. We think this contention is erroneous. If we exclude the value put upon the article insured by the applicant, there is no other representation made which is not susceptible of investigation and verification to the same extent as in other forms of insurance. Neither do we think this form of insur-

ance requires such haste in the execution of the contract as exists in marine risks, but here the company would lose no more by such delay as is necessary for investigation than might be incident to a delay in executing other contracts of insurance, such as fire, etc. There is no more necessity for haste in insuring works of art than in insuring any other personal property or buildings. The moral hazard, as affected by the person of the applicant, is no greater in one case than in the other, and is susceptible of ascertainment as quickly in one as the other. For the reasons given, we conclude that this form of policy is more analogous to insurance contracts other than marine, and should be governed by the rules applicable to this class of insurance contracts.

By reason of the nature of the contract, as embodied in the particular form of policy herein considered (valued policy), the question is not one of how much the plaintiff should recover, but whether or not he is entitled to recover at all; because if the contract is a valid and enforceable one, the amount of recovery is fixed. So that the contention of the appellant must be, and is, that the contract as an entirety is voided for certain specified reasons, and that the appellee, therefore, is not entitled to recover anything.

The provision of the policy in respect to the avoidance of liability for misrepresentation or concealment is: "This entire policy shall be void if the assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof." It follows that, by the express agreement of the parties, the policy is void only in case the fact misrepresented or concealed is material. The materiality of a misrepresentation or concealment is generally a question of fact to be found by the jury. *Franklin Ins. Co. v. Coates,* 14 Md. 299; *Mutual Ins. Co. v. Deale,* 18 Md. 26; *Columbian Ins. Co. v. Lawrence,* 10 Pet. 507, 9 L. Ed. 512. There may be, however, cases where the falsity or materiality is established by such clear, convincing, and uncontradicted evidence that it becomes the province and duty of the court to so declare as a matter of law. *Metropolitan Life Ins. Co. v. Jennings,* 130 Md. 625, 101 A. 608; *Loving v. Mutual*

*Life Ins. Co.,* 140 Md. 173, 117 A. 323; *Stiegler v. Eureka Life Ins. Co.,* 146 Md. 629, 127 A. 397. The evidence by which the alleged falsity and materiality is sought to be established is such as to make this case fall within the general rule; and we have no doubt that the falsity and materiality of the representations and concealment relied upon to avoid the policy were properly left to the jury. The Roloson letter of September 22nd, 1927, constitutes the application; and there were no other representations. This application was voluntary, made on behalf of the appellee, not in the form of answers to questions submitted. The letter requests Ream, Wrightson & Co. to secure a binder for $75,000 "all risks cover on an original manuscript on sheepskin. 'The Seven Books of Moses,' consisting of eleven rolls"; and "for your general information as to the moral hazard," the statements which followed in the letter were made. It is difficult to conceive that an insurance company would execute a permanent valued policy of insurance in this amount, upon an application for a binder which contained no more information than the Roloson letter, without some further investigation; but such was done in this case. The company accepted the valuation on the manuscript as stated in the application for binder, wholly in disregard of its intrinsic or market value, and with no attempt on its part to further ascertain its true value. The appellant explains this by saying that, when applications are received through reputable agencies, policies are issued without further investigations, because they are usually desired immediately, and any failure to deliver promptly would result in loss of business through the agency applying. The weight of authority seems to establish that the company is entitled to rely upon representations made in the application for insurance; and in many forms of insurance, by the terms of the policy, the application is made a part of the contract. The information is usually in the form of answers to specific questions propounded by the company. This rule is more strictly applied in cases where it is not reasonably possible, without defeating the purpose for which the insurance is sought, to inquire into the truth of the matters stated in the

application, as illustrated by marine policies. It is argued by the appellant that the marine insurance rule should be applied in all cases where investigation is impracticable. In our opinion, this would be injecting into insurance contracts an additional element of uncertainty, which is not warranted by authority. Under such a construction, there are innumerable circumstances which the company could claim made it impracticable to investigate. The application now before us, on its face, indicates that the information therein contained was intended as a lead for further investigation, rather than positive statements to be used as a basis for the issuing of the policy. The tone of the application and the language used is pregnant with the suggestion that its purpose was to serve as a basis for further investigation by the company. "From what we have been able to learn," "we are told," "it looks to be," are not such expressions as would be used in making positive statements of fact. The thing requested in the application was a binder; and while Roloson, for this purpose, was the agent of Mallick, the application would certainly convey to one of ordinary intelligence the knowledge that the statements therein contained were not answers to questions propounded to Mallick, but a voluntary statement by Roloson as to information gained by him throughout the period of his acquaintanceship with Mallick, and which Roloson desired the company to use as a basis for obtaining such further information as he thought they might require. The appellant contends that there is contained in this application such misrepresentations and concealments as, under the terms of the policy, would vitiate it. There is an important distinction between the effect of representations made in an application for insurance, contained in answers to questions propounded, and information volunteered in a loosely written letter constituting the application. In the latter case the applicant is not presumed to know what information the company deems material, and therefore may misrepresent or fail to disclose information which the company may desire; while in the first instance, by the very fact of asking questions, the insured is presumed to know that the company considers the

answers material in determining whether the policy will be written at all, or if written, at what rate, and therefore the information solicited by the questions must be full and substantially true.

"A representation is a statement incidental to the contract, relative to some fact having reference thereto, and upon the faith of which the contract is entered into. If false and material to the risk, the contract is avoided. Such false statement is termed in insurance a misrepresentation, which has been well defined to be the statement of something as fact which is untrue in fact, and which the insured states knowing it to be untrue, with the intent to deceive the insurers, or which he states positively as true without knowing it to be true, and which has a tendency to mislead, such fact in either case being material to the risk and adverse to the insurers. *Daniels v. Hudson River Fire Ins. Co.,* 12 Cush. (Mass.), 416; *Campbell v. New England Mut. Life Ins. Co.,* 98 Mass. 381. A representation is not necessarily a part of the contract of insurance, or of its essence; but, as it is rather something collateral or preliminary, and in the nature of an inducement to it, it should in general, by some phraseology of the policy, be made part thereof. A false representation, unlike a false warranty, does not vitiate the contract or avoid the policy, unless it relates to a fact actually material, or clearly intended to be made material, by the agreement of the parties. *Weil v. New York Life Ins. Co.,* [47 La. Ann. 1405, 17 So. 853], 24 Ins. L. J. 641; *Fowler v Aetna Fire Ins. Co.* [6 Cow.] (N. Y.) [673], 16 Am. Dec. 460." 1 *May on Insurance,* sec. 181.

In *Fidelity & Casualty Co. v. Alpert,* 67 Fed. 460, it is held: "When the policy does not make the application a part of the contract and contains no warranty as to the truth of statements in the application, such statements will not defeat the policy unless both material and untrue, and the question is one of fact for the jury." In *Conn. Fire Ins. Co. v. Colorado Leasing Co.,* 50 Colo. 424, 116 P. 154, 156, the policy provided that it should be void if the insured had concealed any material fact or circumstance concerning the insurance

or the subject thereof, or in case of any fraud by the insured touching any matter relating to the insurance or the subject thereof, whether before or after loss. It will be seen that the above provision is practically the same as contained in the policy now before us. In that case the court said: "The defendant claims that inasmuch as these matters, which it says were concealed, were material, the court should have instructed for it. The defendant loses sight of a very important fact in this case, and that is that no inquiry was made of the plaintiff about the matters alleged to have been concealed, and that no written application was made for this insurance. 'Concealment is the designed and intentional withholding of any fact, material to the risk, which the assured in honesty and good faith ought to conmmunicate.' *Clark v. Union Mut. F. Ins. Co.,* 40 N. H. 333. So that a concealment involves, not only the materiality of the fact withheld and which ought to have been communicated, but also the design and intention of the insured in withholding it, and, of course, the condition in the policy must be construed in the light of this definition of a concealment with which it is concerned. If an inquiry is made about a material fact and that fact is not disclosed upon such inquiry, it is very likely that the person questioned intended to withhold it; but, if no inquiry is made, the intention to withhold the fact is not so plain. Hence the authorities make a distinction between cases where inquiry is made and cases in which no inquiry is made. The rule is stated in *Wood on Insurance,* 388: 'When no inquiries are made, the intention of the assured becomes material, and, to avoid the policy, they must find, not only that the matter was material, but also that it was intentionally and fraudulently concealed.' " After citing cases in support of the rule thus stated, the court goes on: "It is thus seen that in the circumstances of this case it is not alone the materiality of the facts which were withheld that was to be found, but also whether or not the plaintiff intentionally and fraudulently withheld them. The materiality of these facts was not fixed by any writing, as is often the case in insurance, but it must be drawn from circum-

stances. So also must the fraudulent intent of the insured be drawn. It is said in 1 *May on Insurance,* sec. 195, that, where the materiality is to be inferred from circumstances and not upon the construction of some writing, it is a question for the jury. How much more would the fraudulent intent of the insured in withholding these facts be for the jury? It was not for the court to say as a matter of law that the facts alleged to have been concealed were material, and that the insured had intentionally and fraudulently withheld them, and hence no error was committed in refusing to instruct the jury to return a verdict for the defendant so far as such concealments were concerned."

In *British Ins. Co. v. Cummings,* 113 Md. 350, 76 A. 571, 574, it is said: "Whether an alleged misrepresentation or concealment will avoid a policy of insurance depends upon its materiality to the risk undertaken. * * * The alleged misrepresentation made in the application for the insurance is not a warranty, and, if proven to be untrue, does not avoid the policy, unless material to the risk assumed by the insurer. The burden of showing the falsity of this representation as well as its materiality is upon the defendant."

There is this further provision of the policy: "Any fraud or false swearing by the assured touching any matter relating to this insurance or the subject thereof, whether before or after loss, shall vitiate the policy." And it is contended that there has been such fraud or false swearing as would bring about that result. The burden is upon the company to establish the fact of fraud or false swearing, and, like misrepresentation or concealment, it is generally a jury question. Certainly it is such in this case, because if fraud or false swearing be established as a fact, it must be gathered from conflicting and contradictory testimony, or inferences drawn therefrom. The facts and circumstances of this case do not present such a one as would justify the court in finding, as a matter of law, that there had been established any of the defenses relied upon by the appellant to avoid the policy; and we expressly refrain from indicating any opinion as to the establishment of fraud, false swearing, misrepresentation, or

concealment, but hold that, under the facts and circumstances, as disclosed by this record, those questions were properly submitted to the jury.

In view of the great number of prayers offered, and an unusually large number granted, we deem it not inappropriate to say that such practice may result in defeating the only legitimate and proper purpose of instructions on the law, namely, to advise the jury as to what the law is governing the facts to be established by them. It can easily be seen that the jury may be confused and misled by the mere number and length of prayers, even though they correctly state the law. Such practice has a tendency to induce a jury to disregard the prayers and decide the case without regard to the court's instructions.

We find no error in the ruling on the prayers.

We have carefully examined the exceptions to evidence, but find nothing in these rulings which would warrant a reversal.

*Judgment affirmed, with costs.*