## BLAIR v. NATIONAL SECURITY INS. CO.
### No. 7828.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 18, 1942.

Decided March 23, 1942.

956

Gregory S. Rivkins, of New York City (Lum, Tamblyn & Fairlie, of Newark, N. J., and William J. Tillinghast, Jr., of New York City, on the brief), for appellant.

John E. Toolan, of Perth Amboy, N. J. (David T. Wilentz and Harold N. Gast, both of Perth Amboy, N. J., on the brief), for appellee.

Before MARIS, CLARK, and GOODRICH, Circuit Judges.

CLARK, W., Circuit Judge.

Plaintiff-appellee had insured certain items of jewelry under what is known in the trade as a jewelry-fur floater policy. The policy with its rider is for $11,850 and was effective on January 3, 1939. Six weeks later plaintiff went on a West Indies Cruise on the S. S. Statendam. On returning to her cabin late one night she found it in a "state of confusion".[1] On a friend's advice she had the stewards immediately search for a "small green silk bag" which had the insured articles in it and which she had put "in between her stockings in the dresser".[2] The stewards did not find the bag. But the next morning the stewardess found it "between the washstand and the baggage"[3] mirabile dictu sans jewelry.

Upon claim made, it appeared that the plaintiff had been rather in the habit of losing things—particularly things that she happened to have had insured. Twenty-five years ago she lost her son's cane and her own earrings[4] and nine years ago she made a claim for an $800 diamond ring and a $1,000 worth of other personal property[5] stolen by a domestic in her home. It further appeared that she was in financial difficulties having given a bad check for an overdue mortgage and having failed to pay her taxes. In spite of the apparent frequency of these losses they seem to have made little impression on the loser. In her sworn proof of loss she was able to remember only the walking stick. This same vagueness was the cause of the failure to make any disclosure at all at the time the floater policy was written.

In spite of what seems to us these rather damaging facts, the jury returned a verdict for the full amount of the policy. Defendant is aggrieved at such an unjust result. Counsel first asked the trial judge to correct it by a motion to set aside the verdict. We do not altogether understand counsel's failure to pursue this method of redress. The refusal of such a motion is appealable.[6] However that may be, he abandoned the facts and resorted to the law. He complains of two portions of the learned district judge's charge. They read:

"I instruct you that at the time the fact alleged to have been material to the risk was concealed, it must have been known to the plaintiff and she must have known that that fact was material to the risk. I instruct you that a mere mistake of judgment, her failure to recollect the fact, or if she had no knowledge that the fact was material to the risk, then that concealment of that fact, does not bar her recovery under this policy. I instruct you that in the

---

[1] Appendix to Appellant's brief, p. 5.
[2] Appendix to Appellant's brief, p. 6.
[3] Appendix to Appellant's brief, p. 16.
[4] Fireman's Policy, No. PE 10048.

[5] Ocean Accident and Guarantee Policy No. 167633.
[6] 28 U.S.C.A. following section 723c, Rule 50, note 16.

absence of inquiry the defendant wrote this policy at its peril and in the absence of that inquiry the plaintiff had a right to assume that the fact concealed was not material unless she knew, even though no inquiry was made, that the fact was material and with that knowledge she wilfully concealed it with intent to cheat and defraud the defendant." Appendix to Appellant's brief, p. 33.

"Now, if you find from all the evidence and with the inferences to be drawn therefrom that the plaintiff wilfully and with intent to cheat and defraud the defendant submitted a proof of loss containing a misrepresentation as to a material fact, she is barred from recovery. * * * The misrepresentation in the proof of loss, in order to warrant the forfeiture of the policy, must be a misrepresentation as to a material fact made with intent to cheat and defraud the defendant." Appendix to Appellant's brief, p. 34.

■ The first excerpt raises an interesting question. It is conceded, as it must be, that the pertinent law is that of New York.[7] Appellant asserts that that law is made clear only in the touching statute.[8] Appellee's counsel, on the other hand, considers the one selected irrelevant and relies on what he says the New York courts would decide if they considered the matter in the light of, according to him, sound reasoning. We cannot altogether agree with either of these views. We do, of course, assent to both sides' insistence that the decision turns upon whether the ordinary[9] or the marine[10] rule is applicable.

The argument from the statute leads up to a conclusion exactly opposite to that of the insurance company. In the first place, we cannot deduce anything from the definition section.[11] These so-called floater policies long antedate that enactment.[12] They were the result of a demand for the simple and comprehensive coverage of portable personal property.[13] Because marine insurance companies had had long experience with water transportation, it was logical for them to extend their operations to the risks attendant upon inland travel.[14] The floater policies were a further extension in the same ambit.[15] So the charters of the marine companies permitted the business whereas the charters of the fire and casualty companies did not. The law relied on is then only a general enactment to that same effect.[16] It has since been amended to include fire insurance companies.[17] Curiously the appellant seems to misunderstand the very definition it argues about. It cites sub-section c which explains what is known as the jeweler's block policy[18] (insurance of personal property in a jewelry store) instead of sub-section a—the true floater.[19] The confusion apparently arises from the exclusion and inclusion of the word "jewels". The casualty companies are allowed to write these last policies but not the floaters.[20] The definition then is to license certain types of corporate forms to do certain classified kinds of business. The classification is negative to any substantive rule of law governing any particular risk.

■ But we find a more positive reac-

[7] 2 Beale, Conflict of Laws, §·346.4.

[8] N. Y. Insurance Law, § 46(20).

[9] 3 Couch on Insurance §§ 775 and 776.

[10] 3 Couch on Insurance § 793.

[11] "The kinds of insurance which may be authorized in this state, subject to the other provisions of this chapter, are set forth in the following paragraphs. * * *

" 'Marine insurance,' meaning insurance against any and all kinds of loss or damage to: * * * all personal property floater risks."
N.Y. Insurance Law, § 46(20) (a).

[12] Brief in Behalf of Ocean and Inland Transportation and "All Personal Property Floater Risks" Underwriters, Appendix GG; Charles, Historical Background and Definition of Inland Marine Insurance (Insurance Institute of America, Inc., New York, N. Y.) (1939).

[13] "Still another factor contributing to the growth of transportation insurance was the enormous growth and wide diffusion of personal fortunes, which created a demand for increased insurance on personal property of a portable nature." Appleman, Inland Marine Insurance, § 6.

[14] Appleman, Inland Marine Insurance, § 7.

[15] Appleman, Inland Marine Insurance, §§ 65 and 67.

[16] Appleman, Inland Marine Insurance, § 8.

[17] N.Y. Insurance Law, § 341.

[18] Brief in Behalf of Ocean and Inland Transportation and "All Personal Property Floater Risks" Underwriters, Appendix FF; 67th Annual Report of the Superintendent of Insurance of the State of New York, p. 57, § 150.

[19] Appleman, Inland Marine Insurance, § 66.

[20] N.Y. Insurance Law, § 311.

tion in another portion of the New York Insurance statute. That law gives a rather exhaustive definition of warranty and prescribes the effect to be given to a breach thereof.[21] The effect is less "strenuous", one might say, than the rule applicable in the case of marine risks.[22] By an express exception, however, the statutory rule is made limited rather than inclusive.[23] From it are excluded what are known as ocean or wet risks. It follows that the statutory policy differentiates between land and water and adheres to stricter rules for the latter. The floater policy is by concession an inland marine risk.

We turn now to the case law of New York. Although we are restricted to that narrow solution we may be assisted in arriving at it by some consideration of the ideal as well as the actual. It may be some reflection of the business ethics fostered by a system of individual competition that the parties to a contract are permitted to deal at arms length.[24] I can buy my neighbor's land for a song, although I know and he doesn't that it is oil bearing. That isn't dishonest, it is "smart business" and the just reward of my superior individualism. In some instances the law, at any rate, gagged a bit; if competitive conditions do not prevail, for instance, as in cases of fiduciary relationships[25] or if the rule discourages competition altogether.[26] It is rather difficult to determine which of the two considerations influences the classification of insurance contracts.[27] Probably both do. At least they have been referred to as úberrimae fidei[28] in England and in the United States. The two countries, however, are not in accord in their interpretation of the uberrimae. In the leading English case of Carter v. Boehm,[29] Lord Mansfield declared that even an innocent concealment of a material fact made the contract voidable saying:

"The question, therefore, must always be, 'whether there was, under all the circumstances at the time the policy was underwritten, a fair representation, or a concealment, fraudulent if designed, or, though *not designed,* varying materially the object of the policy, and changing the risk understood to be run.'" Carter v. Boehm, 1766, 3 Burrows 1905 (italics ours). The later English cases seem to modify this rule somewhat. The non-disclosed material fact in the case of Horne v. Poland[30] was alienage of the insured in a burglary policy. Mr. Justice Lush avoided the policy and we find him saying:

"If a *reasonable* person would know that underwriters would naturally be influenced, in deciding whether to accept the risk and what premiums to charge, by those circumstances, the fact that they were kept in ignorance of them and indeed were misled, is fatal to the plaintiff's claim." Horne v. Poland [1922] 2 K.B. 364, 367 (italics ours).

Our earlier judges agreed with their brethren across the sea.[31] Gradually, however, the rule has been relaxed.[32] Until now nearly all our courts have gone to the opposite extreme and have laid down

---

21 McKinney's Consolidated Laws of N. Y., Insurance Law, § 150; Baldwin's New York Insurance Law § 150; New York State Insurance Law Revision, Tentative Draft 1937, § 63.1.

22 See footnote 20.

23 "Nothing contained in this section shall affect the express or implied warranties under a contract of marine insurance in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation, including war risks, on, over or under any seas or inland waters, nor shall it affect any provision in an insurance contract requiring notice, proof or other conduct of the insured after the occurrence of loss, damage or injury." N.Y.Insurance Law § 150(3).

24 3 Restatement of Torts § 551.

25 3 Restatement of Torts §§ 550, 551; Pollack, Law of Torts p. 307.

26 Patterson, Essentials of Insurance Law, Chapter XI, Concealment By the Insured, pp. 380, 381.

27 For a history of these contracts, see, Vance, The Early History of Insurance Law, 8 Columbia Law Review 1; Holdsworth, The Early History of the Contract of Insurance, 17 Columbia Law Review 85.

28 3 Couch on Insurance § 776.

29 3 Burrows 1905 (1776). The facts in this case are perhaps of timely and tragic significance. The policy there written was for an English fort on the Island of Sumatra and the broker failed to disclose several letters from the insured revealing its weakness.

30 [1922] 2 K.B. 364.

31 1 Biddle, Insurance (1893) § 537.

32 Insurance: Non-disclosure and fraud, 25 Cornell Law Quarterly 612, at 613.

the principle as charged by the learned trial judge in the case at bar. The reason therefor, has nowhere been better stated than by the late Chief Justice Taft:

"When the applicant has fully and truthfully answered all these questions, he may rightfully assume that the range of the examination has covered all matters within ordinary human experience deemed material by the insurer, and that he is not required to rack his memory for circumstances of possible materiality, not inquired about, and to volunteer them. * * * The application is generally prepared, and the questions are generally answered, under the supervision of an eager life insurance solicitor. * * * The applicant is likely to trust the judgment of the solicitor as to the materiality of everything not made the subject of express inquiry, and, with the solicitor's strong motive for securing the business, there is danger that facts communicated to him may not find their way into the application." Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 6 Cir., 72 F. 413, 435, 38 L.R.A. 33.

Information may be either volunteered, elicited by question and answer or obtained through the use of the senses. As the ratio decidendi of the American decisions is the ease of inquiry, all hazards would seem alike to them. The early English and the present marine rule make no allowance for this but lay emphasis rather upon the convenience or inconvenience of inspection. One might expect it, therefore, to distinguish between moral and physical risks. You can look at a ship but a person's character does not, according to the criminologists, yield itself up from the physiognomy. In the principal case, for instance, the plaintiff had changed her name and the discovery of her previous losses would have been an extremely difficult task. On that view, of course, we should apply the marine standard.

The only authority in New York is to the contrary. In a case in the Appellate Division, decided in 1898, a fire insurance risk was avoided for failure to disclose the condition of a vessel. In so holding the Court said:

"This difference between marine and fire insurance is said by an accepted authority upon the subject to be not 'so much one of doctrine as of the subject-matter, and of the degree of confidence necessarily placed in the assured by the underwriter.' 1 Phil. Ins. § 635. Property insured against loss or damaged by fire is, says this same author, 'usually stationary, and the risk local, and within the limits of actual inspection by the insurers or their agents. * * * And, besides, the inquiries put to the assured, his answers to which are usually referred to in the policy, are intended by the insurer to cover, and usually do cover, all the circumstances affecting the risk material to be disclosed.' And he then states the rule to be that 'any circumstance evidently and materially enhancing the risk of fire, known to the applicant at the time of insuring, and not so, or presumed to be so, to the insurer, and of which he is not bound to inform himself or to take the risk of it, must be disclosed, though no inquiry is made respecting it.' 1 Phil.Ins. § 635. * * * But, even had there been other inquiries and answers, we do not think that there would exist in this case any reason for applying a different rule of obligation to the assured than would have been the case if they had applied for marine instead of fire insurance. The subject of insurance was a vessel which was laid up in a harbor many hundreds of miles distant from the place where the insurance was effected. It was consequently not 'within the limits of actual inspection by the insurers or their agents.' In accepting an application for insurance under these circumstances, the underwriters had a right to assume that the owners or their agent would act in perfect good faith, and disclose any and all facts material to the risk of which they had any knowledge; and it seems to us that they were under precisely the same obligation to do so as they would have been had they been seeking to obtain an insurance of their vessel against the perils of water." Clarkson v. Western Assur. Co., 33 App.Div. 23, 53 N.Y.S. 508, 512, 513.

In other words, the learned Court made the test, ease of inspection regardless of the character of the policy. This New York case was not cited by either party but its reasoning underlies the decision of the case which the parties conceded was the only one squarely in point. There the

960

Maryland Court of Appeals refused to apply the marine rule to a fine arts floater policy.[33] The Judge writing the opinion said:

"The appellant contends that a fine arts policy is analogous to a marine policy, in that the difficulties of verifying the truth of statements or representations made by the applicant are the same, and, further, that the contract is required to be promptly executed and without time necessary for investigation. We think this contention is erroneous. If we exclude the value put upon the article insured by the applicant, there is no other representation made which is not susceptible of investigation and verification to the same extent as in other forms of insurance. Neither do we think this form of insurance requires such haste in the execution of the contract as exists in marine risks, but here the company would lose no more by such delay as necessary for investigation than might be incident to a delay in executing other contracts of insurance, such as fire, etc. There is no more necessity for haste in insuring works of art than in insuring any other personal property, or buildings. The moral hazard, as affected by the person of the applicant, is no greater in one case than in the other, and is susceptible of ascertainment as quickly in one as the other. For the reasons given, we conclude that this form of policy is more analogous to insurance contracts other than marine, and should be governed by the rules applicable to this class of insurance contracts." Sun Ins. Office, Limited, v. Mallick, 160 Md. 71, 153 A. 35, 41.

■ We need not greatly concern ourselves with the appellant's argument with respect to the proof of loss. Fraud and false swearing in proofs of loss are only a defense if the policy itself contains a stipulation to that effect.[34] We find no such provision in the jewelry fur-floater of the principal case. The learned trial judge in leaving the matter to the jury at all gave, therefore, the appellant more than it was entitled to. Obviously, we do not have to consider whether his particular prescription is sound.

The judgment of the District Court is affirmed.

---

[33] Appleman, Inland Marine Insurance, § 69.

---

[34] 3 Couch on Insurance, § 1557.