The **CHESAPEAKE & POTOMAC TELEPHONE COMPANY OF MARYLAND,** a body corporate

v.

**ALLEGHENY CONSTRUCTION COMPANY, a body corporate of the Commonwealth of Pennsylvania, and Pennsylvania National Mutual Casualty Insurance Company, a body corporate of the Commonwealth of Pennsylvania.**

Civ. No. 19152.

United States District Court, D. Maryland.

Jan. 21, 1972.

Paul V. Niemeyer, Baltimore, Md., for plaintiff.

W. Hamilton Whiteford, Baltimore, Md., for defendant Allegheny Construction Co.

Alva P. Weaver, III, Baltimore, Md., for defendant Pennsylvania National Mutual Casualty Ins. Co.

FRANK A. KAUFMAN, District Judge.

The Chesapeake & Potomac Telephone Company of Maryland (C & P), a Maryland corporation with its principal place of business in Maryland, seeks, in this suit against Allegheny Construction Company (Allegheny) and Pennsylvania National Mutual Casualty Insurance Company (Pennsylvania National), both Pennsylvania corporations with their respective places of business in Pennsylvania, a declaratory judgment pursuant to 28 U.S.C. § 2201. Diversity jurisdiction exists under 28 U.S.C. § 1332(a).

On August 24, 1961, C & P and Allegheny entered into a contract pursuant to which Allegheny agreed, *inter alia,* to erect and replace telephone poles,[1] to hold

---

1. Specifically, Allegheny agreed to— execute all work and furnish such tools and equipment, as TELEPHONE COMPANY may require, necessary to erect, reset, straighten, relocate, restencil, retamp, and remove poles; place, remove, and straighten crossarms; place and remove anchors, guys, cable, ter-

harmless C & P from all liability "arising from said work, or from any act or negligence of" Allegheny, and to carry liability insurance to protect both C & P and Allegheny.[2]

Pursuant to the 1961 agreement and at C & P's request, Allegheny undertook, on October 25, 1962, to take the wires from certain telephone poles near Chestertown, Maryland, and to remove those poles from the ground. In the course of that operation, one of Allegheny's employees, Ralph W. Lods (Lods), was seriously injured when the telephone pole which he had climbed for the purpose of removing its wires, and to which he had attached himself, toppled over onto the bed of an adjacent roadway, pinning Lods underneath.

At the time of that accident there was in effect a policy of manufacturers' and contractors' liability insurance (MC), issued to C & P by Pennsylvania National's predecessor in interest[3] for the policy period, July 1, 1960–July 1, 1963. Among other coverage, that policy afforded, under the heading, "Independent Contractors," insurance against bodily injury liability of up to $100,000 for each person injured. Also in effect at the time of Lods' accident was a policy of comprehensive general insurance (CGL), issued by Pennsylvania National to Allegheny for the policy period, July 1, 1962–July 1, 1963, which *inter alia,* afforded insurance against "contractual bodily injury liability" of up to $100,000 for injury to one person and of up to $300,000 for injuries arising from one accident.

After Lods suffered his accident, Pennsylvania National, as the workmen's compensation insurer of Allegheny, began to pay to Lods compensation insurance pursuant to the undertakings of the workmen's compensation policy. Lods

---

minals, wire and insulators; transfer crossarms, guys, cable, terminals, and wires, replace insulators; tighten guys; and perform all other work incident to the construction, reconstruction, or replacement of pole lines along such roads, highways, or private property as TELEPHONE COMPANY may from time-to-time designate within the State of Maryland.

2. The agreement included the following insurance provisions:

> CONTRACTOR shall carry liability insurance approved by TELEPHONE COMPANY, which shall protect TELEPHONE COMPANY and CONTRACTOR, jointly or separately from any claim, suit or action that may arise from accident or injury to any person, persons, or property. The term of the policies must cover the entire time when any work is being done under this agreement and until the acceptance of said work by TELEPHONE COMPANY as being entirely completed.

\* \* \* \* \* \* \* \* \* \* \* \* \*

> CONTRACTOR shall be deemed to have complied with TELEPHONE COMPANY's requirements if it carries the following insurance:

| | |
|---|---|
| Contractor's Public Liability | |
| Bodily Injury | $50,000.00–$100,000.00 |
| Property Damage | 10,000.00– 25,000.00 |
| Owner's Contingent Liability | |
| Bodily Injury | 50,000.00– 100,000.00 |
| Property Damage | 10,000.00– 25,000.00 |
| Automobile Public Liability | |
| Bodily Injury | 100,000.00– 300,000.00 |
| Property Damage | 15,000.00 |
| Workmen's Compensation | As required by Maryland State Statutes |
| Completed Operations Insurance | 50,000.00– 100,000.00 |

---

3. Hereinafter, Pennsylvania National's predecessor in interest is referred to as Pennsylvania National and is not distinguished from Pennsylvania National.

also initiated, for his own use and for the use of Pennsylvania National as the compensation insurer, a $1,000,000 damage suit in the Superior Court of Baltimore City, against C & P, alleging, *inter alia:*.

> While the Plaintiff was upon the pole in the performance of his duties, the telephone pole because of its rotted and deteriorated condition at a point below the surface of the ground snapped and broke off throwing the Plaintiff to the ground where he was struck by the falling pole and where he sustained serious and permanent injuries hereinafter to be described. Plaintiff alleges that his fall and subsequent injuries were the direct result of the negligence of The Chesapeake and Potomac Telephone Company, its agents and servants, without any negligence on his part contributing thereto, because of the following reasons:

> (a) The Chesapeake and Potomac Telephone Company approximately a year before this accident had transplanted the telephone pole which broke to the position it was on [sic] the date when Plaintiff fell and at the time of the transplant the pole was then in a deteriorated condition or about to be in a deteriorated condition in the very near future, all of which a proper inspection and the exercise of due care would have disclosed, but the Defendant, knowing or having the ability to know of the condition of said pole and the fact that utility men were to climb it, permitted and invited the Plaintiff, Ralph W. Lods, as an employee of Allegheny Construction Company, to climb upon the pole when it was an unsafe place in which to work;

> (b) That in transplanting the pole aforesaid well-knowing that in the ordinary course of business pursuits that [sic] linesmen would climb the pole, the Defendant failed to transplant it in a proper and customary manner, failed to treat the wooden pole with chemical or other type of substance which would insure its safety and preservation and thus failed to provide the Plaintiff, Ralph W. Lods,

> with a safe place in which to work when it invited him as an employee of Allegheny Construction Company upon its property for the purpose of work; and

> (c) In failing to inspect the aforesaid telephone pole prior to inviting and allowing Plaintiff, Ralph W. Lods, as an employee of Allegheny Construction Company, to climb upon said pole for the purpose of performing his work when a proper inspection coupled with knowledge or access to knowledge of The Chesapeake and Potomac Telephone Company of the age and condition of the pole would have revealed it as an unsafe working place; and

> (d) In general in negligently failing to provide the Plaintiff with a safe place in which to work when he, as an employee of Allegheny Construction Company, was upon the property of the Defendant, The Chesapeake and Potomac Telephone Company, as a business invitee.

The declaration goes on to describe serious, painful and permanent injuries to Lods, including "severance or damage" to Lods' spinal nerve cord and resulting "paralysis of arms, legs and body."

C & P, alleging in the within proceeding that Allegheny and Pennsylvania National have refused to assume the defense of Lods' state court action against C & P and to acknowledge their respective obligations to C & P, asks this Court for a declaratory judgment with regard to (1) the coverage of Pennsylvania National's MC policy, (2) Allegheny's indemnification and hold-harmless obligations, (3) the coverage of Pennsylvania National's CGL policy, and (4) Allegheny's obligations if the CGL policy does not afford the contractor's liability coverage required by Allegheny's contract with C & P. Allegheny and Pennsylvania National also seek declaratory judgments with regard to their respective obligations. Because there are no factual disputes among the parties, all three of them appropriately seek summary judgment herein.

## I. CHOICE OF LAW

### A. General.

■■■ In the exercise of diversity jurisdiction a district court looks to the law of the state in which the court sits to determine what conflict of laws rule is applicable. Klaxon Co. v. Stentor Electric Mfg Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The issues involved herein all arise *ex contractu*. In Mackubin v. Curtiss-Wright Corp., 190 Md. 52, 57, 57 A.2d 318 (1948), the Court of Appeals of Maryland held that "[i]t is a general rule of comity that the law of the place of contracting determines the validity and effect of a promise with respect to the nature and extent of the duty for the performance of which a party becomes bound." "A contract is made at the time when the last act necessary for its formation is done and at the place where that final act is done." Restatement of Contracts § 74 (1st ed. 1932). The Supreme Court of Pennsylvania has enunciated that same rule. Craig v. W. J. Thiele & Sons, Inc., 395 Pa. 129, 149 A.2d 35 (1959). So has the Court of Appeals of Maryland. Grain Dealers Mut. Ins. Co. v. Van Buskirk, 241 Md. 58, 65–66, 215 A.2d 467 (1965); Sun Ins. Office v. Mallick, 160 Md. 71, 81, 153 A. 35 (1931).

### B. The August 24, 1961 Contract.

■■■ In this case, the August 24, 1961 contract was first signed by C & P in triplicate. Then, the three copies were forwarded by C & P to Allegheny on August 23, 1961, and, after execution by Allegheny, the latter returned one of the originals to C & P in Baltimore where the latter retained it. As Allegheny's signature was the last act needed for its creation, the contract was apparently formed in Pennsylvania. Accordingly, under Maryland's choice-of-law rule, Pennsylvania law would seem to govern the construction of the contract.[4]

### C. The Policies.

■■■ The CGL policy, under which Allegheny was the insured, was issued in Pennsylvania by Wasson Insurance Agency of Pennsylvania (Wasson) on behalf of the insurer and was delivered in Pennsylvania to Allegheny by Wasson. Thus, Pennsylvania law, the *lex loci contractus* controls the construction of the CGL policy. The MC policy, effective July 1, 1960, was issued on behalf of the insurer by Wasson after it had been countersigned in Maryland by an agent of Pennsylvania National, resident in Maryland, and returned to Pennsylvania National in Pennsylvania. Although C & P was the insured under this policy, it was transmitted in Pennsylvania by Wasson to Allegheny, which, in accordance with its obligation under a predecessor to Allegheny's August 24, 1961 agreement with C & P, procured the MC policy and paid its premium. Allegheny subsequently delivered the policy to C & P, The parties do not know where that delivery took place though it was almost surely either in Pennsylvania or in Maryland. It would appear that Allegheny

---

4. In this case, the August 24, 1961 agreement was one in a series of many contracts governing work which Allegheny had been performing for C & P since 1952. The August 24, 1961 agreement was a renewal of a similar, previous contract. At the time that previous contract expired the new proposed August 24, 1961 contract was located, in triplicate, in Baltimore, not yet executed by Allegheny.

"When a formal contract is made in renewal of an earlier formal contract, the place of contracting is where the new document is at the time when the old document ceases to exist by the law of the place of its performance." Restatement of Conflicts § 313 (1st ed. 1934). That rule would not seem applicable in this case, since when the previous contract expired, the August 24, 1961 agreement had not been fully executed. Therefore, the "new document" was not "a formal contract * * * made in renewal of an earlier formal contract" at the time the "old contract cease[d] to exist."

In any event, assuming *arguendo* that for any reason Maryland law would govern the interpretation of the August 24, 1961 contract, that result would not, for reasons developed under II, *infra*, cause any different conclusion to obtain in this case.

acted as C & P's agent in accepting the MC policy and that therefore that policy became effective in Pennsylvania. However, it is noted in that connection that C & P, under the August 24, 1961 agreement and presumably under the predecessor agreement in effect when the MC policy was issued, had the right to approve all policies required by the agreement and that, in addition, C & P, as the insured, agreed, pursuant to a provision in the MC policy, that the policy was issued in reliance upon information furnished by the insured to Pennsylvania National. Nevertheless, the course of dealing was such that it would seem that C & P looked to Allegheny to obtain the MC policy for C & P. Thus, this Court holds that Pennsylvania law governs the construction of the MC policy. But if it does not, Maryland law controls and the application of Maryland law will not cause any substantive conclusion herein to be different from that which obtains under Pennsylvania law.

## II. THE MC POLICY

Lods' suit against the insured C & P alleges bodily injury and asks damages on account thereof. Thus, if liability for the bodily injury which Lods has alleged in his suit is liability for which insurance "is afforded by the MC policy," then Pennsylvania National is obligated to defend C & P in that action, regardless of the merits of Lods' allegation.[5] The MC policy's coverage is for "bodily injury * * * caused by accident[6] and arising out of the hazards" defined by the policy. Coverage is not provided for "any act or omission of the named insured or any of his employees, other than general supervision of work performed for the named insured by independent contractors." A special endorsement to the policy stated, *inter alia*, that its coverage "is limited to operations performed for the Insured by the Allegheny Construction Company, Centre Hall, Pennsylvania."

The hazards are defined as— Operations performed for the named insured by independent contractors and general supervision thereof by the named insured, if the accident occurs in the course of such operations, other than (a) maintenance and repairs at premises owned by or rented to the named insured and (b) structural alterations at such premises which do not involve changing the size of or moving buildings or other structures. Exception (a) is inapplicable herein because the activities, during the conduct

---

5. *See* Kelly v. Phoenix Assurance Company of New York, 225 F.Supp. 562, 564 n. 3 (D.Md.1964); Wilson v. Maryland Cas. Co., 377 Pa. 588, 592, 105 A.2d 304 (1954); 7A Appleman, Insurance Law and Practice § 4683 (1962). In the *Wilson* case, the Supreme Court of Pennsylvania wrote that—

> "the nature of plaintiff's *claim* against the stock company [the insured] . . . determined whether the company [the casualty insurance company] was required to defend," but if the *claim* came within the scope of the policy the company was obliged to defend even though the claim might be wholly groundless, false or fraudulent. (Quoting from West Philadelphia Stock Yard Co. v. Maryland Casualty Co., 100 Pa.Super. 459, 462 (1930). *See also* the annotation to *Wilson* at 50 A.L.R.2d 458 (1956), where it is stated:
>
> > Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*See also* West Philadelphia Stock Yard Co. v. Maryland Cas. Co., *supra*; University Club v. American Mut. Liability Ins. Co., 124 Pa.Super. 480, 189 A. 534 (1937), both cited by the annotation in support of that statement.

6. It is to be noted that the liability insured against is for *any* accidental injury, and not merely any *negligent* injury, arising from the hazards described in the MC policy.

of which Lods' injury occurred, were neither "maintenance" nor "repairs," but were the removal of a telephone pole. Exception (b) does not apply because that exception covers only "structural alterations," and even if the telephone pole in question is "a structure," it was being "moved" when Lods was injured. Hence, it cannot be said that Lods' activities were concerned with "structural alterations . . . which do not involve . . . moving . . . structures." *Cf.* Aetna Cas. & Sur. Co. v. Ocean Accident & Guar. Corp., 386 F. 2d 413, 415 (3d Cir. 1967).

The word "and" which precedes the words "general supervision," like the two main descriptive phrases of this definition, is used in the disjunctive.[7] Thus, it follows that C & P's liability for Lods' injury is covered by the MC policy if the injury was one "arising out of" *either* "operations performed for the named insured by independent contractors" *or* "general supervision thereof by the named insured, if the accident occurs in the course of such operations."

██ The activities of Allegheny at the time and place of Lods' injury were "operations performed for the named insured," C & P, by Allegheny, an independent contractor. An accident occurred. Thus, the question is presented as to whether the injuries alleged by Lods are injuries "arising out of" the operations. The research of this Court and counsel has yielded but one opinion of the Pennsylvania courts with regard to the meaning of the phrase "arising out of," namely, Manufacturers Cas. Ins. Co. v. Goodville Mut. Cas. Co., 403 Pa. 603, 170 A.2d 571 (1961). In that case, those words were part of the phrase "caused by accident and arising out of the ownership, maintenance or use" of an insured trailer. The owner of the trailer, Wertz, had loaned the trailer to another, Stoltzfus, who attached it to a truck which Stoltzfus had rented from a third party. The trailer and the truck were

covered by liability insurance issued by different insurers. While Stoltzfus' employee was driving the truck with the trailer attached, he lost control of the truck, resulting in a collision between another car and the trailer. That accident was, apparently, in no way *caused* by the use of the trailer. Nevertheless, the Court held that the accident was one "arising out of" Wertz's ownership, maintenance or use of the trailer. In refusing to equate the words "arising out of" with the words "proximately caused by," the Court wrote (at 607–608, 170 A.2d at 573):

> When the provisions of an insurance policy are vague or ambiguous, they must be construed strictly against the insurer and liberally in favor of the insured. Had the insurer desired to limit its liability to accidents with such a close causal connection to the ownership, maintenance or use of the trailer as to be encompassed within the scope of proximate causation, it could have and should have so stated in its policy. Construed strictly against the insurer, "arising out of" means causally connected with, not proximately caused by. "But for" causation, i. e., a cause and result relationship, is enough to satisfy this provision of the policy. Unquestionably the trailer was in "use" at the time of the accident, since it was being used for the very purpose of its existence, viz., to transport a horse. But for the fact of its being so used on this occasion, [the other driver's] automobile would not have collided with it.

*Goodville* was cited and relied upon by the Third Circuit in 1967 in Aetna Cas. & Sur. Co. v. Ocean Accident & Guar. Corp., *supra*, in which the relevant policy language was word-for-word the same as in the MC policy herein.

In support of its holding in *Goodville*, the Supreme Court of Pennsylvania cited, *inter alia,* American Fire & Cas. Co. v. Allstate Ins. Co., 214 F.2d 523 (4th Cir. 1954), in which Judge Soper, in a case

---

7. However, whether the word "and" is used in the disjunctive or in the conjunctive, there is, for the reasons set forth in this opinion, coverage in either event.

seemingly involving South Carolina law and in which the policy provided coverage for injuries "caused by accident and arising out of the ownership, maintenance or use of the automobile," cited only an opinion of an intermediate California appellate court, and apparently applied general law principles. In the *American Fire* case, an automobile collision occurred between a car in which the injured parties were riding and a Chrysler which was itself towing a jeep. The Chrysler and the jeep were insured under different liability policies. Judge Soper held that the jeep was in use within the language of the policy and that the injuries were "caused by accident arising out" of that use.

In Standard Oil Co. v. Fidelity & Cas. Co. of N. Y., 66 F.Supp. 603 (W.D.Ky. 1946), the Court, applying Kentucky law in construing the phrase "arising from the work . . . performed for the insured by independent contractors . . .," cited numerous decisions of the courts of that State which dealt with whether an injury could be said to have "arisen from" such work. *See also* Hartford Accident & Indem. Co. v. Cardillo, 72 App.D.C. 52, 112 F.2d 11 (1940); Phil Hollenbach Co. v. Hollenbach, 181 Ky. 262, 281, 204 S.W. 152 (1918), involving workmen's compensation policies.

Lods has alleged that he climbed the pole in the course of his duties, and that while he was still on the pole, it fell, injuring him. Applying the reasoning of the Pennsylvania court in *Goodville* to Lods' allegations and to the phrase "arising out of" as those words appear in the MC policy, it becomes apparent that Lods seeks recovery for injuries "arising out of" the operations performed for C & P by Allegheny in that, "but for" the operations having been conducted, Lods would not have been injured during the course of them. Just as, in *Goodville,* the accident arose out of the use of the trailer without having been caused by that use, so here any injuries which Lods sustained arose out of the fact that the operations involved Lods' being upon the pole, regardless of whether those operations, on the one hand, or conduct of C & P at any time whether during or prior to those operations, on the other hand, or both, constituted the proximate cause of his accident.

Although this Court's determination that the injuries alleged by Lods were injuries arising out of operations performed for C & P by Allegheny is dispositive of the issue of Pennsylvania National's obligation to defend C & P, this Court notes that the alleged injury was one also alleged by Lods to have arisen out of the other hazard covered by the MC policy, namely, "general supervision [of such operations] by the named insured [i. e., C & P], if the accident occurs in the course of such operations." The MC policy does not define "general supervision." As the policy was drafted by Pennsylvania National, any ambiguities contained in its language must, if Pennsylvania law applies, be resolved against the insurer. Vrabel v. Scholler, 369 Pa. 235, 85 A.2d 858 (1952); Snader v. London & Lancashire Indem. Co., 360 Pa. 548, 551, 62 A.2d 835 (1949). Applying a similar rule of construction to policy language which was identical to that relevant herein, a Missouri federal district court held, in Southwestern Bell Telephone Co. v. Western Cas. & Sur. Co., 269 F.Supp. 315 (E.D.Mo.1967), that a telephone company's failure to provide to an independent contractor a plat which would have revealed the presence of electrified cables in the area in which the contractor's employees were drilling was a failure of the company's "general supervision." In so holding, the Court (at 318) discussed the meaning of the words "general supervision":

> A liberal interpretation of the term would surely include supervisory duties both on and away from the jobsite and, thus, instructions, warnings, and the furnishing of maps and plats would be supervisory whether done or omitted to be done at or away from the jobsite.

*See also* Union Elec. Co. v. Pacific Indem. Co., 422 S.W.2d 87 (Mo.App. 1967). This Court is of the opinion that when and if faced with the issue, the Pennsylvania courts will follow Missouri's lead in *Southwestern Bell.*

Lods has alleged that C & P "permitted and invited" him, "as an employee of Allegheny Construction Company, to climb upon the pole when it was an unsafe place in which to work," and that "in general" C & P failed to provide him "with a safe place in which to work . . . ." Those allegations are taken by this Court to assert a failure by C & P to warn Lods or Allegheny of the pole's condition. That failure to warn was part of C & P's general supervision of the operations. Under the rationale of *Goodville*, Lods' alleged injuries arose out of that failure to warn, and out of C & P's general supervision, and were "causally connected with" that failure, i. e., "but for" C & P's failure to warn Lods or Allegheny of the pole's condition, the accident would not have occurred. That causal connection existed regardless of whether C & P was or was not negligent in failing to warn. Accordingly, if Pennsylvania law applies, Lods' allegations that his injuries arose out of C & P's supervision also obligates Pennsylvania National under the MC policy to defend against the action instituted by Lods.

■ If Maryland law applies, that result will still obtain. It is true that "Maryland has not adopted the rule followed in many jurisdictions that an insurance policy is to be most strongly construed against the insurer," Ebert v. Millers Mut. Fire Ins. Co., 220 Md. 602, 611, 155 A.2d 484, 488 (1959). But the Court of Appeals of Maryland went on to state in *Ebert* (also at 611, 155 A.2d at 489) that "where an instrument is drawn by one party an ambiguity will be resolved against the party who drafted the document." *Ebert* was cited and followed in Pennsylvania Thresh-

ermen & Farmers' Mut. Cas. Ins. Co. v. Shirer, 224 Md. 530, 536–537, 168 A.2d 525 (1961); *see also* United States Fidelity & Guaranty Co. v. Nat. Pav. Co., 228 Md. 40, 50, 178 A.2d 872 (1962). In addition, the Court of Appeals of Maryland has held that, while the words "arising out of" "import and require a showing of causal relationship, recovery is not limited to the strict rules developed in relation to direct and proximate cause." National Indemnity Co. v. Ewing, 235 Md. 145, 147, 200 A.2d 680, 682 (1964), cited in Frazier v. Unsatisfied Claim & Judgment Fund Bd., 262 Md. 115, 118, 277 A.2d 57 (1971), in which the words "arises out of" were also held to require coverage. *National Indemnity*, like *Frazier*, involved an automobile liability policy. In *National Indemnity*, the Maryland Court cited, *inter alia*, on a "see" basis (235 Md. at 150, 200 A.2d 680), with apparent approval, the Pennsylvania Supreme Court's opinion in *Goodville*. Thus, if Maryland law applies, Lods has alleged facts which bring coverage under the MC policy into play with regard to "operations performed for" C & P by Allegheny. And while no Maryland court appears to have spoken to the point, this Court finds no reason to believe that Maryland would take any different position with regard to the "general supervision" coverage than did the Missouri court in *Southwestern Bell*.

### III. INDEMNIFICATION BY ALLEGHENY

■ If Lods should recover in his state court negligence action against C & P, the question may arise as to whether C & P is entitled to be indemnified by Allegheny.[8] The indemni-

---

8. The contract included, under the heading, "Relationship of Parties," the following paragraph:

> It is understood and agreed that in the performance of this AGREEMENT the CONTRACTOR shall be and remain in all respects an independent CONTRACTOR and shall hold TELEPHONE COMPANY harmless from any and all claims, demands, and liability on account of its violation of any ordinances, statute, or regulations, or

on account of the injury, loss or damage, to any person or property arising from said work, or from any act or negligence of CONTRACTOR or any of its workmen, and CONTRACTOR hereby assumes all responsibility and liability in any and all of said contingencies. CONTRACTOR shall also be responsible for and hold TELEPHONE COMPANY harmless from all damage due to imperfect construction.

fication provision in the August 24, 1961 agreement does not affirmatively and specifically provide that Allegheny will hold C & P harmless for C & P's own negligence. Nor does the agreement contain any "clearly expressed or unequivocal" [9] language to that effect. While the provision that Allegheny will hold C & P harmless "from *any and all* claims, demands, and liability on account * * * of the injury * * * to *any* person * * * arising from said work, or from any act or negligence of [Allegheny] or of any of its workmen" and the provision that Allegheny "assumes *all* responsibility and liability in *any and all* of said contingencies," speak for themselves, their strength cannot cure the defect caused by their lack of affirmative specificity. (Emphases supplied.) Under Pennsylvania law, such words of general import do not constitute an assumption by the indemnitor of liability for the indemnitee's own negligence. Perry v. Payne, 217 Pa. 252, 66 A. 553 (1907). In *Perry,* referred to as a "leading case" by the Supreme Court of Pennsylvania in Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185, 187 (1961), the contract language, namely, that the indemnitor "shall protect and keep harmless the [indemnitee] . . . from damages arising from accidents to persons employed in the construction of . . . the said work" (*id.* at 554), was equally as all-encompassing as that in the Allegheny —C & P contract. Although the holding in *Perry* was based in part upon the Court's analyzing that language in the light of other provisions in the agreement which made the contractor liable only for the consequences of his own acts, the Court unqualifiedly stated (217 Pa. 252, 262, 66 A. 553, 557):

> We think it clear, on reason and authority, that a contract of indemnity against personal injuries, should not be construed to indemnify against the negligence of the indemnitee, unless it is so expressed in unequivocal terms. The liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, that there can be no presumption that the indemnitor intended to assume the responsibility unless the contract puts it beyond doubt by express stipulation. No inference from words of general import can establish it. * * * [10]

---

9. Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa. 53, 171 A.2d 185, 189 (1961).

10. The Court, in *Perry,* also wrote (217 Pa. 252, 259, 66 A. 553, 555):

> It is contrary to experience and against reason that the contractors should agree to indemnify Perry against the negligence of himself or his employes. It would make them insurers, and impose a liability upon the contractors, the extent of which would be uncertain and indefinite, and entirely in the hands of Perry. The results of such a liability might become most disastrous. While the consideration named in the contract for the construction of the building and indemnifying the owner was large, yet it was wholly inadequate to justify the contractors in assuming liability for his negligence in view of the responsibility in constructing the building. The profits to be realized on the contract were entirely too small to warrant the contractors in agreeing to assume a liability of such great proportions and of such unlimited extent. A single act of negligence on the part of the owner or his employes, over whom the contractors would have no restraint or control whatever, might create a liability which a lifetime of successful business could not repay. An interpretation of the bond which might give rise to such results could hardly be regarded as reasonable or as giving effect to the intention of the parties.

> *See also* Mohawk Drilling Company v. McCullough Tool Company, 271 F.2d 627, 632 (10th Cir. 1959), in which the Court stated:

> > The adjudicated cases generally hold that a clause undertaking to exculpate a party from his own negligence will not be sustained where he enjoys a bargaining power superior to that of the other party to the contract. [Footnote omitted.]

> *And see* United States v. Seckinger, 397 U.S. 203, 211–212, 90 S.Ct. 880, 25 L.Ed. 2d 224 (1970).

*Pittsburgh Steel* left no doubt that *Perry v. Payne* was as accurate an analysis of Pennsylvania law in 1961 as it had been in 1907, since large portions of the *Perry* opinion were extracted and relied upon by the Court in *Pittsburgh Steel*. As in *Perry*, *Pittsburgh Steel* involved an indemnitor-contractor who agreed to make an installation for the indemnitee on the latter's premises; as in *Perry*, an employee of the indemnitee negligently injured another person, who was an employee of the indemnitor's subcontractor. (Here, the injured person, Lods is an employee of the indemnitor, Allegheny.) The agreement in *Pittsburgh Steel* between the plaintiff property owner and the defendant primary contractor included this provision:

*Insurance Clause:* Contractor will indemnify, save harmless and · defend buyer [the plaintiff property owner] from *all liability* for loss, damage or injury to person or property *in any manner* arising out of or incident to performance of this order . . . .

404 Pa. at 55, 171 A.2d at 186 (emphasis supplied). Despite that strong and apparently all-inclusive language, the Court held that no duty to indemnify existed, stating (at 187):

Contracts indemnifying a party against his own negligence are valid [citations omitted]. However, the law is well settled that the intention to include within the scope of an indemnity contract, a loss due to the indemnitee's own negligence, must be expressed in clear and unequivocal language.

*Perry*, among other cases, is cited in support.

▆▆▆ Thus, Pennsylvania's approach to the interpretation of an indemnity and hold-harmless clause is to disregard the all-inclusive nature of "words of general import" in such clauses and, if there is no clear and unequivocal expression of an intent to indemnify the indemnitee for his own negligence, to determine by reference to the agreement whether the parties so intended. In making that determination, Pennsylvania courts engage in the application of a strong presumption against such an intent.

In the instant case, that presumption is raised by the absence of the essential "clear and unequivocal" expression. There is nothing in the language of the agreement which rebuts that presumption. On the contrary, the other undertakings by Allegheny under the indemnity clause—to hold C & P harmless from liability "on account of [Allegheny's][11] violation of any ordinances, statutes, or regulations," or on account of injury, etc., from any act or negligence of contractor or any of its workmen—involve only acts or omissions of Allegheny, and not of C & P.

If the law of Maryland, rather than the law of Pennsylvania, controls the construction of the August 24, 1961 contract, no different result will obtain. While neither this Court's nor counsel's research has turned up an opinion of a Maryland court which deals directly with the question, this Court adopts Judge Thomsen's conclusion in Blockston v. United States, 278 F.Supp. 576, 589 n. 19 (D.Md.1968), that it is the law of Maryland, as well as "the rule adopted by most courts," that, as stated in Thompson-Starrett Co. v. Otis Electric Co., 271 N.Y. 36, 41, 2 N.E.2d 35, 37 (1936), "contracts will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivo-

11. Although the agreement states that " . . . CONTRACTOR . . . shall hold TELEPHONE COMPANY harmless from any and all claims, demands, and liability on account of *its* violation of any ordinances . . .," and thus could conceivably be read to mean that C & P was to be indemnified for *its own* violation, the more natural meaning of that sentence requires "its" to be read as referring to Allegheny, and not to C & P; otherwise, Allegheny might be said not to have agreed to indemnify C & P for such violations by Allegheny, but only for such violations by C & P—a most unusual result which was hardly intended or desired by C & P.

cal terms." *See* American Radiator & Standard Sanitary Corp. v. Mark Engineering Company, 230 Md. 584, 187 A.2d 864 (1963), with its emphasis, in the course of rejecting an implied indemnity obligation, upon the desirability of protecting an employer, who has provided workmen's compensation insurance as required by law, against indirect liability by way of indemnification, flowing from his employee's injury in the absence of his express undertaking to the contrary. *See also* Farrell Lines, Inc. v. Devlin, 211 Md. 404, 421, 127 A.2d 640 (1956).[12] For an exposition of the law generally with regard to an indemnification agreement being read to exclude negligence of the indemnitee unless the agreement provides such indemnity in clear and unambiguous terms, *see* Donnelly v. Rochester Gas & Elec. Co., 44 Misc.2d 855, 255 N.Y.S.2d 573 (1965), involving facts and contractual provisions somewhat similar to those in this case. *See also* United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). In a number of cases, the courts have held that indemnity obligations were intended to protect an indemnitee against its own negligence. *See, e. g.,* Moses-Ecco Co. v. Roscoe-Ajax Corp., 115 U.S. App.D.C. 366, 320 F.2d 685, 688 n. 2 (1963), in which the indemnity specifically covered suits by employees of the indemnitor; Atlantic Coast Line R. Co. v. Robertson, 214 F.2d 746, 752–753 (4th Cir. 1954); Cacey v. Virginia Ry. Co., 85 F.2d 976, 979 (4th Cir. 1963), *but see* Judge Parker dissenting at 979, 981; Maloof v. United States, 242 F.Supp. 175, 187 (D.Md.1965). While a number of the cases in which the indemnitee has been afforded protection against his own negligence present contractual indemnity language and facts not too dissimilar from those involved herein, none of them, in the context of Pennsylvania and Maryland law, teach that in this case this Court should construe Allegheny's indemnity to apply to C & P's own negligence.

## IV.   THE CGL POLICY AND OTHER ISSUES

If Lods should recover in his state court negligence action against C & P, and if this Court's conclusion under III, *supra,* is erroneous and if Allegheny is required to indemnify C & P for any liability C & P incurred to Lods because of C & P's negligence, the question would arise as to whether Allegheny's obligation so to indemnify C & P is covered by the CGL policy.[13] Pursuant to that policy, Pennsylvania National has undertaken, as the insurer of Allegheny and within the dollar limitations of the policy, "[t]o pay on behalf of the insured [Allegheny] all sums which the insured, by reason of the liability assumed by him

---

12. In view of the expositions of Pennsylvania law in *Perry* and in *Pittsburgh Steel* and this Court's adoption of Judge Thomsen's conclusion in *Blockston* with regard to Maryland law, this Court does not reach the question of whether C & P's duty to Lods and to persons like him was different from C & P's duty to members of the public using the highway upon which the allegedly defective telephone pole bordered, or the question of whether C & P may be permitted, since it is a public utility, to enforce indemnification for negligence of the type alleged by Lods to have been committed by C & P. *See, e. g.,* Titan Steel Corp. v. Walton, 365 F.2d 542, 548 (10th Cir. 1966); Fairfax Gas & Supply Co. v. Hadary, 151 F.2d 939 (4th Cir. 1945); RESTATEMENT OF CONTRACTS § 575 (1st ed. 1932).

13. If this Court's conclusion under II, *supra,* is correct and Pennsylvania National is called upon to pay within the $100,000 MC policy limit a judgment in favor of Lods against C & P pursuant to the obligations undertaken by Pennsylvania National under the MC policy, then Pennsylvania National, in its posture as the MC carrier, and as the subrogee of C & P, might well attempt to assert the right to proceed against Allegheny under Allegheny's contractual undertaking to indemnify C & P. Whether any such result was intended by the litigants in this case when the contract and policies in issue herein became effective poses a question which does not need to ·be resolved herein in view of this Court's holding that Allegheny's obligation to indemnify C & P does not extend to the latter's own negligence.

[Allegheny] under any written contract designated in the schedule below, shall become legally obligated to pay as damages because of bodily injury * * *, sustained by any person and caused by accident." The contract between Allegheny and C & P is specifically "designated" in a schedule typed [14] in the blank space of the form of endorsement to the CGL policy. The language of that schedule includes the exception, "no assumption of liability for negligence of the indemnitee [except in] connection with general supervision of work performed by the indemnitor." [15] For the reasons set forth in the discussion under II, *supra,* this Court holds that Lods has alleged that he was injured in connection with C & P's general supervision of Allegheny's work under the August 24, 1961 contract. Thus, the above-quoted non-assumption provision is not applicable herein. However, the policy also contains a general exclusion which renders the policy inapplicable "to any *obligation* for which the insured or any carrier as his insurer may be held liable *under any workmen's compensation,* unemployment compensation or disability benefits law, or under any similar *law*" (emphasis supplied). C & P's contract with Allegheny calls for carriage by Allegheny of three types of insurance: (a) a liability policy naming C & P as the insured; (b) workmen's compensation insurance covering Allegheny as employer; and (c) a general liability policy covering Allegheny in connection with Allegheny's contract with C & P.[16] Whether (c) backstops either (a) or (b), *cf.* Lumber Mut. Cas. Ins. Co. v. Stukes, 164 F.2d 571, 574 (4th Cir. 1947), and what applica-

tion, if any, the above-quoted workmen's compensation exclusion has in this case, constitute questions which do not need to be reached in view of this Court's holding under III *supra.*

Counsel for C & P has contended herein that Pennsylvania National's position as (a) workmen's compensation carrier for Allegheny as employer, (b) liability insurer for C & P under the MC policy, and (c) liability insurer for Allegheny under the CGL policy, and under one or more combinations of Pennsylvania National's duties and rights thereunder, places Pennsylvania National in a position of conflict between its own interests and those of C & P. While, under some circumstances, such conflicts may develop, the policies themselves seemingly do meet the requirements of the August 24, 1961 contract. See n. 2 *supra.* Also, C & P may have waived its rights, if any, to object to the provision of the insurance as not in accord with the 1961 contract. Those questions do not need to be resolved at this time in view of this Court's holdings herein and in view of the undertaking made to this Court by Pennsylvania National's counsel that his client will employ separate counsel to represent the interests of C & P and Pennsylvania National in the pending state court negligence action brought by Lods against C & P.

### V.  CONCLUSION

This Court holds:

1. Pennsylvania National, under its MC policy, is obligated to defend C & P in the state court action brought by Lods for the reason that Lods seeks recovery for injuries "arising out of" (a) the

---

14.  All of the other provisions of the CGL policy quoted in this opinion are printed.

15.  The policy contained the following typed words under the heading "Designation of Contracts":

> Construction Agreements. Indemnification of Owner (Not Railroads) Excluding Martime [sic] Operations. Limited Form Contracts # 0553 Indemnification of the Owner—(Indemnitee) for accidents arising out of the indemnitor's operations—no assumption of liability

for negligence of the indemnitee *exception* connection with general supervision of work performed by the indemnitor (Contract with Chesepeake [sic] and Potomac Telephone Co. of Baltimore, Maryland)  (emphasis supplied)

The parties agree that a typographical error caused the words "except in" to appear as "exception" and that the policy should be read as if the words "except in" had themselves been typed.

16.  See n. 2 *supra.*

operations performed for C & P by Allegheny and also (b) the "general supervision" of such operations by C & P, within the meaning of the MC policy.

2. The indemnification provision of Allegheny's August 24, 1961 agreement with C & P does not extend to C & P's own negligence; accordingly, if Lods should recover in the state court negligence action against C & P, C & P will not be entitled to be indemnified by Allegheny.

It is so ordered and declared.